UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       -v.-

DONALD LONGUEUIL,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Cr. 161 (JSR)

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
      of America

AVI WEITZMAN
DAVID S. LEIBOWITZ
Assistant United States Attorneys

  - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v.- | : 11 Cr. 161 (JSR) |
| DONALD LONGUEUIL, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Donald Longueuil. The Government respectfully submits that a sentence within the stipulated guidelines range of 46 to 57 months is appropriate and "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under 18 U.S.C. § 3553(a)(2).

From at least in or about 2006, through in or about 2010, Donald Longueuil participated in a large insider trading scheme that spanned numerous hedge funds and a number of securities. More specifically, Longueuil, along with hedge fund portfolio managers Samir Barai and Noah Freeman agreed to share with each other material, non-public information ("Inside Information") that each received from numerous sources of Inside Information. As part of their conspiracy, Longueuil, Barai and Freeman attempted to obtain detailed financial earnings and other material information about numerous public companies, including Marvell Technology Group, Ltd. ("Marvell"), NVIDIA Corporation ("NVIDIA"), Fairchild Semiconductor Corporation ("Fairchild"), AMD, Actel Corporation ("Actel"), and Cypress Semiconductor Corporation

i

("Cypress"). Longueuil and his co-conspirators obtained Inside Information both from employees who worked at these and other public companies, as well as from independent research consultants who communicated with employees at public companies. Longueuil, Barai, and Freeman then had regular conference calls and meetings during which each shared the Inside Information he learned with his co-conspirators.

The insider trading scheme was highly sophisticated. Longueuil, Barai, and Freeman not only pooled their resources (financial and otherwise) to ensure that they received as much Inside Information as possible, they also came up with elaborate methods to preserve their scheme and conceal it from law enforcement. And when the FBI began closing in, Longueuil destroyed evidence of his own involvement in insider trading, in an effort to obstruct the FBI's investigation.

A principal purpose of the securities laws is to protect the integrity of the capital markets that enable our country's economy to flourish. When the investing public suspects that Wall Street is rigged, or that Wall Street professionals have privileged access to information, those fears are directed to professionals like Longueuil. When those fears are confirmed – for example, by professionals like Longueuil being caught red-handed on tape discussing their crimes and how the FBI won't ever find evidence of their insider trading because they had destroyed it – the investing public loses confidence in the integrity of our markets. A sentence within the stipulated guidelines range of 46 to 57 months is needed to deter Wall Street professionals like Longueuil from engaging in similar offenses and to restore integrity to the capital markets by reassuring the investing public that when those who commit insider trading are caught red-handed, they will face fair and equitable justice.

## I. The Insider Trading Scheme

Starting at least in or about 2006, the defendant Donald Longueuil, along with his co-conspirators Noah Freeman and Samir Barai – each of whom worked as a research analyst or portfolio manager analyzing semiconductor and technology stocks for separate hedge funds – sought out material, non-public information regarding numerous semiconductor companies from various sources of Inside Information. Many of the sources were employed at public companies and provided Inside Information to Freeman, Barai, and/or Longueuil in breach of fiduciary and other duties of trust and confidence, while other sources were independent research consultants who had obtained Inside Information from employees at public companies. Through these means, Longueuil, Freeman and Barai obtained Inside Information about numerous public companies, including Marvell, NVIDIA, Fairchild, AMD, Cypress, and Actel.

Longueuil, Freeman and Barai were extremely close friends. As such, although they worked for different hedge funds throughout much of the period of the conspiracy, they shared their Inside Information with each other in an effort to increase the pool of Inside Information to which they had access. Longueuil, Freeman, and Barai regularly had lengthy conference calls – often called "data dumps" or "data smack-downs" – and/or met with each other at conferences to share the Inside Information each had found. In addition, the three of them often split the costs associated with hiring and utilizing certain inside sources and research consultants who obtained and provided Inside Information to them.

In addition, Longueuil, Barai and Freeman employed various techniques to protect their scheme from discovery by law enforcement. For example, they saved any electronic records evidencing their communications with company insiders on external flash drives or hard drives,

rather than on hedge fund servers, and attempted to communicate primarily through personal e-mail accounts, rather than the hedge fund e-mail accounts. Longueuil often used an e-mail addresses that was comprised solely of numerals, rather than his name, in an effort to hide his identity when communicating with co-conspirators. Members of the scheme at times communicated over Skype, believing that their telephone calls could not be wiretapped or recorded over Skype. Through these relatively sophisticated means, the scheme continued and flourished for several years.

Inside Information From Winifred Jiau

Among other individuals, one of the co-conspirators who Barai and Freeman had hired to provide them with Inside Information was Winifred Jiau, a/k/a "Wini," a/k/a "Pooh." Barai and Freeman met Jiau through one of the expert networking firms in or about 2006, and later that year, they convinced Jiau to sign up as a consultant for them through Primary Global Research ("PGR"). Jiau previously had worked in the Finance Department at Taiwan Semiconductor Manufacturing Corp. ("TSMC"), and starting in or about March 2007, Jiau began to work as a contract employee in the Finance Department of NVIDIA. Through her employment at NVIDIA, Jiau formed an "investment club" with another finance employee at NVIDIA and a finance employee at Marvell. Jiau thus had access to NVIDIA's and Marvell's detailed and non-public financial earnings results for several quarters in 2007 and 2008, and Jiau provided such information to Freeman and Barai through her consultancy at PGR. In exchange, Freeman and Barai caused PGR to pay Jiau as much as $10,000 a month. While Longueuil was not a PGR client at the time, Longueuil nonetheless obtained the benefit of the Inside Information consultants like Jiau provided by obtaining such information from Freeman and Barai.

For example, on or about May 23, 2008, Jiau had a telephone conversation with Barai, during which Jiau advised Barai that Marvell's upcoming quarterly earnings report would include revenues of approximately $805 million, gross margins of approximately 53%, and earnings per share ("EPS") of five or six cents above Wall Street's expectations. Jiau had obtained this Inside Information from her contact in the Marvell finance department. Barai passed along this Inside Information to Longueuil via instant message ("IM") communication.

Barai subsequently had a follow-up conversation with Jiau on or about May 28, 2008, at approximately 11:19 a.m. During that conversation, Jiau told Barai that Marvell's quarterly revenues came in at $804 million, that Marvell's non-GAAP [referring to Generally Accepted Accounting Principles] gross margins would be approximately 52%, and that Marvell would announce GAAP EPS of approximately 11 cents per share.

As a result of the Inside Information that Longueuil received regarding Marvell, Longueuil caused Empire Capital, the hedge fund where Longueuil was then employed, to purchase a substantial amount of Marvell stock. While Longueuil's hedge fund was not invested in Marvell stock between May 13 and May 27, 2008, on or about May 28, 2008, Longueuil e-mailed the portfolio managers at Empire Capital and advised them to purchase Marvell stock. That same day, Empire Capital purchased approximately 400,000 shares of Marvell, at a price of approximately $14.08 per share.

On or about May 29, 2008, following the close of trading, Marvell announced its financial results for the quarter ending on May 3, 2008. The company announced net revenues of $804 million, reported GAAP net income of $69.9 million, or 11 cents per share (diluted), and non-GAAP gross margins of 52%. On the following day, shares of Marvell closed trading at

$17.36 per share, up approximately $3.28, or approximately 23.3% over the previous day's close. Given the large jump in the value of Marvell stock the day after the quarterly announcement, Empire Capital earned net profits of approximately $1,251,685 from its trading in Marvell stock.

Longueuil's Obstruction of Justice

On or about November 19, 2010, the *Wall Street Journal* published an article titled, "U.S. in Vast Insider Trading Probe." The article reported that federal authorities were investigating "pervasive insider trading" through expert networking firms and "independent analysts and consultants" who service hedge funds. One of the expert networking firms named in the article was PGR, the hedge fund at which Winifred Jiau was employed. After reading that article, Longueuil destroyed his flash drive that contained the "log" of information he received from other inside sources, as well as two external hard drives containing the "wafer data" Longueuil obtained. Longueuil tore apart the flash drive and hard drives with two sets of pliers and placed the destroyed electronics in separate bags. He then left his Manhattan apartment building at approximately 1:52 a.m. on November 20, 2010, and walked the streets of Manhattan for 40 minutes to find four different garbage trucks in which to discard the various pieces of destroyed electronics. As Longueuil later admitted to Freeman in a conversation that was consensually-recorded, Longueuil's flash drive and external hard drives were "chopped . . . up" and "ripped apart" -- "[e]verything's gone."

II.     **Procedural Background**

On or about February 8, 2011, Longueuil and Barai were arrested on the basis of a complaint charging them with conspiracy to commit insider trading and obstruction of justice. On or about March 8, 2011, Longueuil was indicted by a Grand Jury sitting in this District in

three counts: (1) conspiracy to commit securities fraud and wire fraud (Count Three), (2) substantive securities fraud (Count Four), and (3) obstruction of justice (Count Five). The case was subsequently assigned to the Honorable Jed S. Rakoff, and a trial date was scheduled for June 2011.

Following multiple motions, including the filing of a motion to dismiss and discovery motions, Longueuil ultimately decided to plead guilty in advance of trial. On or about April 28, 2011, Longueuil pled guilty to Counts Three and Four of the Indictment. In his plea agreement, Longueuil stipulated that the gain that resulted from the offense was greater than $1,000,000, but not more than $2,500,000, and that he had willfully obstructed and impeded the administration of justice with respect to the investigation and prosecution of the instant offense by destroying a flash drive and hard drives relevant to the offense of conviction. Longueuil further stipulated in the plea agreement that the Sentencing Guidelines range was 46 to 57 months' imprisonment, although either party may seek a sentence below or above that range.

### III.  Consideration of the 3553(a) Factors

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth in 18 U.S.C. § 3553(a). These factors include, among others, (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the need for afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparity. *See* 18 U.S.C. § 3553(a) .

Longueuil's criminal conduct warrants a sentence within the stipulated Guidelines range of 46 to 57 months' imprisonment. At the time he committed these crimes, Longueuil was an

7

experienced investment professional. In fact, during the period of the conspiracy Longueuil was a portfolio manager at one of the most successful and prestigious hedge funds in the world. He conspired with other talented portfolio managers who were privileged to have graduated from this country's best universities and/or business schools. Together, they attempted to cheat the system and gain an unfair advantage over the average investor by obtaining Inside Information from others in order to maximize their investment profits, and in turn, line their own pockets. In so doing, Longueuil and his co-conspirators knowingly, willfully, and repeatedly broke the law.

Insider trading constitutes a violation of the Securities and Exchange Act of 1934. A fundamental purpose of that statute is to ensure fair dealing and outlaw deceptive and inequitable practices in the securities markets. Congress recognized that any deceptive or manipulative practice that influenced or related to trading activity undermined the function and purpose of a free market. Insider trading causes that harm – namely by undermining the public's confidence in the capital markets, and by suggesting to ordinary investors that they should not invest because those markets are rigged in favor of well-connected Wall Street professionals like Longueuil, Barai, and Freeman. The integrity of the markets is critical to the functioning of the nation's economy, which depends upon well-functioning markets for liquidity and access to capital. Not only did his crimes harm the integrity of the markets, they harmed public companies whose business secrets Longueuil and his hedge fund co-conspirators were stealing for their own benefit. When Wall Street professionals like Longueuil repeatedly and brazenly flout the law, they must be punished accordingly.

A stiff sentence is warranted here to deter Longueuil and other Wall Street professionals from engaging in insider trading. As a general matter, because insider trading schemes are both

highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Insider trading is difficult to detect in general, and Longueuil went to great lengths to make his scheme even *more* difficult to detect. Longueuil did not leave a trail of documentary evidence of his criminal conduct. Instead, he attempted to keep any record of his criminal conduct off his hedge fund's servers. He attempted to limit the use of e-mail to obtain and transmit Inside Information. He used a sham e-mail address comprised only of numbers in an effort to hide his identity when communicating with co-conspirators. He referred to his sources of Inside Information by code names. And, when the FBI's investigation became public, he destroyed and got rid of incriminating evidence on his flash drive and external hard drives. That, in addition to the other techniques described above, were all calculated to thwart traditional investigations into insider trading and any prosecution of this insider trading ring. Thus, Longueuil's crimes should be severely punished to send a strong deterrent message, both to Longueuil and to others in the investment community.

    As a result of his long-time involvement in this insider trading scheme, Longueuil deserves a substantial sentence. Should he receive a light sentence, Wall Street professionals would be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that, even if they are caught, they will not face much time in jail. In addition, such a sentence would further shake the public's belief in the integrity of our securities markets by

sending the message to the investing public that even when Wall Street professionals are caught engaging in an extensive insider trading conspiracy and caught red-handed trying to destroy evidence, they are only lightly punished. To deter criminal conduct by Wall Street professionals like Longueuil and effectuate the purpose of the securities fraud laws, a sentence within the Sentencing Guidelines range is warranted and reasonable.

## IV. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the stipulated Guidelines sentencing range of 46-57 months is appropriate.

Dated:  New York, New York
        July 21, 2011

                                   Respectfully submitted,

                                   PREET BHARARA
                                   United States Attorney
                                   Southern District of New York

                                   By: _____
                                   Avi Weitzman / David S. Leibowitz
                                   Assistant United States Attorney
                                   (212) 637-1205/1947