## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> WINIFRED JIAU, a/k/a "Wini," and <br> DONALD LONGUEUIL, <br><br>     *Defendants.* | S1 11 Cr. 161 (JSR) |

## DEFENDANT DONALD LONGUEUIL'S SENTENCING MEMORANDUM

**ALSTON & BIRD LLP**
**Craig Carpenito**
**Gary D. Adamson**
**90 Park Avenue**
**New York, New York**
**(212) 210.9400**

Attorneys for Defendant

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................i

PRELIMINARY STATEMENT .............................................................................1

PROCEDURAL BACKGROUND..........................................................................1

SENTENCING UNDER 18 U.S.C. § 3553(a) ......................................................3

I.      Don Did Not Personally Profit on the Trades .............................................4

II.     Similarly Situated Defendants Have Received Below-the-Range Sentences............9

III.    Don's Criminal Conduct is Not the Sum of The Man ...............................14

        A.      Don's Upbringing ..........................................................................14

        B.      Don's Education..............................................................................16

        C.      Don's Future Marriage and Family................................................17

        D.      Don's Philanthropy ........................................................................18

IV.     A Below-the-Range Sentence is Sufficient to Provide Just
        Punishment for the Offense ........................................................................21

CONCLUSION......................................................................................................22

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bateman, Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985) .................................................................................10, 11

*Kimbrough v. United States,*
    552 U.S. 85 (2007)..........................................................................................3

*SEC v. Thome,*
    638 F. Supp 596 (S.D.N.Y. 1986) ..............................................................11

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...........................................................7

*United States v. Booker,*
    543 U.S. 200 (2005)........................................................................................3

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005).............................................................................3

*United States v. Giovanelli,*
    464 F.3d 346 (2d Cir. 2006) ........................................................................13

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006).............................................................................3

*United States v. Preacely,*
    628 F.3d 72 (2d Cir. 2010)...............................................................................3

**Rules and Statutes**

15 U.S.C. § 78ff ...................................................................................................2

15 U.S.C. § 78j(b) ................................................................................................2

15 U.S.C. § 78u(d)(2) .........................................................................................11

18 U.S.C. § 2.........................................................................................................2

18 U.S.C. § 371..................................................................................................1, 2

18 U.S.C. § 3553..............................................................................................7, 12

18 U.S.C. § 3553(a) ..................................................................................... *passim*

**Rules and Statutes**                                                                                    **Page(s)**

18 U.S.C. § 3553(a)(1)......................................................................................3

18 U.S.C. § 3553(a)(2)......................................................................................6

18 U.S.C. § 3553(a)(6)......................................................................................9

18 U.S.C. § 1512(c).........................................................................................2

17 C.F.R. § 240.10b-5.......................................................................................2

**Other Authorities**

H.R.Rep. No. 98-355, at 9.................................................................................11

U.S. Code Cong. & Admin. News 1984, p. 2282................................................11

Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, S. Ill. U. L.J. 485 (1998)....................7

Richard Frase, *Punishment Purposes,* 58 Stanford L. Rev. 67, 80 (2005) .........................7

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) ...........7

Case Dockets

*United States v. Collotta*, 07 Cr. 143 (VM) ..........................................................10

*United States v. Gansman*, 08 CR. 471 (MGC),
   Indictment, May 27, 2008 (S.D.N.Y.) ............................................................8, 9

*United States v. Goehring*, 05 Cr. 209 (JES),
   Indictment, Feb 24, 2005 (S.D.N.Y.)............................................................8, 10

*United States v. Holzer*, 09 Cr. 470 (VM),
   Sentencing Tr., September 29, 2009 (S.D.N.Y.) ................................................8

*United States v. McDermott et al.*, 00 Cr. 0061 (RO)............................................10

*United States v. Okada*, 07 Cr. 144 (DC),
   Indictment, Feb. 26, 2007 (S.D.N.Y.)............................................................8

Xujia Wang, et al., 07 Cr. 00730 (DC),
   Sentencing Tr., Dec. 4, 2007 (S.D.N.Y.) ......................................................11

## PRELIMINARY STATEMENT

Donald Longueuil has acknowledged his guilt and now comes before the Court to accept the consequences of his actions. In doing so, Don hopes that the Court will consider the man as a whole, and not the caricature of a greedy yuppie portrayed by the Government and the press, through its ample coverage of this matter. The facts belie these portrayals of Don as an insatiable, self-interested hedge-fund manager out to maximize profits without regard to the propriety or legality of his methods. Indeed, Don lacks the characteristics of most accused of this crime: Don never traded on material non-public information in his personal accounts; Don never received a bonus or direct profits from the May 28, 2008 trade of Marvell stock in question; and Don never shared material non-public information with family members or anyone else outside of the conspiracy. Similarly situated defendants have received below-the-Guidelines range sentences and we urge the Court to consider those cases when determining Don's sentence.

In addition to the circumstances surrounding the offense conduct, the Court should also consider Don's personal characteristics and contributions to the community, which illustrate the truly aberrational nature of his criminal conduct. As early as High School, Don has devoted his resources and, more significantly, his personal time to helping the less-fortunate. The Government ignores these key facts, which indicate that Don poses no future threat to society and that he has a demonstrated a vested interest in improving and helping others.

## PROCEDURAL BACKGROUND

Don was arrested on February 8, 2011 and was indicted on March 8, 2011 upon the Government's filing of a five-count superseding Indictment ("Indictment") related to "insider information" received from "expert networking firms." Pursuant to the Indictment, Don was charged with one count of conspiracy to commit securities fraud and wire fraud (Count Three)

pursuant to Title 18, United States Code, Section 371; one substantive count of securities fraud (Count Four) pursuant to Title 15, United States Code, Sections 78j(b) & 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2; and one count of obstruction of justice (Count Five) pursuant to Title 18, United States Code, Sections 1512(c) and 2.

On April 28, 2011, before this Court decided any of Don's evidentiary motions or his motion to dismiss, Don pleaded guilty to Counts Three and Four of the Indictment.  At Don's plea allocution, he admitted to having received material non-public information regarding Marvell revenue and gross margins from Samir Barai ("Barai") prior to Marvell's public earnings report on May 29, 2008.  He also pleaded to having caused the principals of Empire Capital to execute a trade of 400,000 shares of Marvell company stock on May 28, 2008 based on the material non-public information he was provided by Barai.  Don further admitted that from 2006 to 2010, he conspired with others, specifically Barai and Noah Freeman ("Freeman"), in Manhattan, New York to obtain material, non-public information for the purposes of benefiting the Hedge Funds where he was employed.  Finally, Don admitted that after reading a newspaper article concerning investigations into alleged insider trading at investment firms in November 2010, he disposed of a flash drive and external hard drives relevant to the conspiracy.

The Plea Agreement contains a presumptive Guidelines range of 46-57 months.  We do not dispute the Guidelines calculation which produces that range.  In addition, The Plea Agreement contains a stipulated forfeiture amount of $1,251,685.  The Plea Agreement also

provides that the defense can argue for a below-the-range sentence based on the factors enumerated in 18 U.S.C. § 3553(a) (2010), and we do so herein.[1]

## SENTENCING UNDER 18 U.S.C. § 3553(a)

The factors outlined in 18 U.S.C. § 3553(a) have taken on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 200 (2005), requiring "sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.' 18 U.S.C. § 3553(a)(1)." *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (J. Lynch concurring). The "overarching" charge of Section 3553(a) is the "Parsimony Clause," which "instruct[s] district courts to 'impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (emphasis added). Judges have freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, *see United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), and to give "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances." *See United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

The §3553(a) factors are well-known to the Court:

> (a)      Factors to be considered in imposing a sentence. –The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1)      the nature and circumstances of the offense and history and characteristics of the defendant;
>
> (2)      the need for the sentence imposed –

---

[1] We have reviewed the final Presentence Report ("PSR") submitted by the Probation Department, and other than the Recommendation Section, the Justification given in respect of the recommendation, and Don's objections (made on his behalf by counsel) reflected therein, we have no further objection to the PSR.

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from the further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the [Sentencing Guidelines]

***

(5)     any pertinent policy statement –

***

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense."

We respectfully submit that upon consideration of all pertinent factors, a below-the-range sentence is just and appropriate.

## I.     **Don Did Not Personally Profit on the Trades**

In May of 2008, Don was a Managing Director at Empire Capital.  At that time Don had already verbally agreed to start employment at CR Intrinsic, a company affiliated with SAC Capital ("SAC Capital") in the coming weeks.

Prior to Marvell's May 29, 2008 public announcement, Barai shared material non-public information that he had received from Winifred Jiau ("Jiau") regarding Marvell's revenues and gross margin with Don.  Don knew that the source of the information was Jiau; however, Don had never personally met nor spoken with Jiau.  After receiving the information from Barai, Don suggested to the principals of Empire Capital that they make a small trade in Marvell stock prior to the May 29, 2008 public announcement.  *See* May 28, 2008 e-mail from Donald Longueuil to

Scott Fine and Peter Richards of which a true and accurate copy is attached hereto as Exhibit A. As a result of Don's suggestion, the principals of Empire Capital executed a trade of 400,000 shares of Marvell stock on May 28, 2008[2].

Don did not personally profit financially from the May 28, 2008 trade of 400,000 shares of Marvell stock.  As indicated above, Don would shortly be starting at CR Intrinsic and, as a result, Don was never eligible for any potential bonus from the Marvell trade at Empire Capital. He resigned from Empire Capital on June 11, 2008.   Moreover, Don didn't stand to gain anything from his future employer, CR Intrinsic, and notably is not alleged to have tried to garner any favor or reputational enhancement by "tipping" CR Intrinsic or SAC Capital with the information.  The facts indicate, and Don will attest, that the primary purpose in providing the information to the principals at Empire Capital was to show his continued loyalty to his then current employer.  It was a stupid and unwise way to do it, that ultimately proved criminal, but it was not an act that found its genesis in any desire Don had to financially benefit himself.  Unlike the behavior of Jiau, Barai and Freeman, Don's admitted criminal behavior was not indicative of an individual that allowed his greed to drive his choices; rather, Don's behavior showed a serious failure of judgment while attempting to please someone else.

Despite not having personally benefited from the May 28, 2008 transaction, Don is willing to forfeit, from his personal savings, the gross profits realized by Empire Capital using first in first out accounting methodology.  Under such an analysis, Empire Capital netted a paper profit of $1,251,685, though no such profit was ever realized by Don or the firm. [3]  Although the

---

[2]  The principals at Empire Capital made an additional trade of 400,500 shares of Marvell stock on May 29, 2008 prior to Marvell's public announcement.  However, Don was not in the office on May 29, 2008 and did not learn of the additional Marvell trade until after the fact.

[3]  Interestingly, Empire Capital netted only a marginal profit from its trading in Marvell Stock around the May 29, 2008 earnings announcement at issue.  In fact, the FBI's calculations show

May 28, 2008 trades would inevitably garner Don praise and accolades from his former employer and potentially in the industry, Don never expected to have any of that money find its way into his pocket and none of it ever did.

Don understands the gravity of his actions and while he is willing to forfeit the gross amount as retribution for his criminal conduct, it seems arbitrary and inconsistent with the purposes of 18 U.S.C. § 3553(a) to deliver a prison term based on a profit calculation that does not reflect any profit realized by Don or by any other party.   Indeed, placing an inordinate amount of emphasis on a loss calculation which bears only a slight resemblance to reality does little to accomplish any of the policy objectives of sentencing, e.g., promoting respect for the law, providing a just punishment, affording adequate general deterrence, or protecting the public from further crimes.  *See* 18 U.S.C. § 3553(a)(2).

In fact, in this case, the amount of gain does not correspond to any increase in the desire to do wrong or violate the law – it reflects neither a more culpable mental state, nor a more wrongful act.  It is clear that the Guidelines range represents an attempt to alter the cost benefit analysis of committing crime by ensuring that the cost of crime goes up in tandem with the benefit a would-be wrongdoer might attain; however, under the specific circumstances of this case, the cost of crime advanced at an exponentially faster pace than the benefit Mr. Longueuil gained from his illegal conduct or ever could have gained. Even assuming that the average wrongdoer makes a cold calculated cost benefit analysis before committing a crime, which one likely does not, the attempt to attain general and specific deterrence embodied in the Guidelines

---

that Empire Capital's total profit from its trading of Marvell stock around the May 29, 2008 earnings report was a mere $63,965.  As a result, and pursuant to Empire Capital's fee structure, the hedge fund likely received net profits of approximately $12,793, i.e., a performance fee of 20%.   Even if Don had been eligible to receive a bonus from the Marvell trade, it would have amounted to slightly less than $1,300.

is excessively more than is necessary under § 3553(a), and, as a result, a below-the-range sentence is called for under the circumstances.

In fact, there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders. *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) citing Richard Frase, *Punishment Purposes,* 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. ILL. U. L.J. 485, 492 (1998); *Cf.* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis added).   And, respectfully, the court should only impose a sentence that is "not greater than necessary" to comply with the purposes set forth in paragraph 2 of 18 U.S.C. § 3553.

A below-the-range sentence is especially appropriate here given the substantial amount of forfeiture that Don is willing to pay.  As this court has noted in the past, "in the case of financial fraud … an important kind of retribution may be achieved through the imposition of financial burdens." *Adelson*, 441 F. Supp. 2d at 514.  In this case, the court should place considerable weight on Don's willingness to forfeit the gross profits derived from the May 28, 2008 trade of 400,000 shares of Marvell stock, in the amount of $1,251,685, because, as stated above, it does not reflect any personal gain to Don or any other party and, as such, constitutes a true penalty.

In addition to not having profited personally from the offense conduct, Don did not seek to exploit the inside information by providing it to his family and friends.  This is true despite the fact that Don's family could definitely have used the extra money as evidenced by Don's brother's and his mother's inability to pay for their college tuition or meet their monthly

financial needs.   According to the Government, there was nothing to stop Don from sharing

inside information that he received with his friends and family, yet he chose not to.  For example,

Harold Smith, a close personal friend of Don's, writes:

> During those summer visits, we had very many opportunities to
> talk about Donald's business travels and I enjoyed knowing and
> hearing that he was being successful.   During those many
> conversations, Donald could have given me "inside" information.
> Although he may have wanted to help me earn some money, he
> never provided the kind of information that could ever be
> described as "improper".  If he could reward anyone outside of his
> immediate family by providing inside information, it would have
> been me.  There was ample opportunity for him to do so.  He never
> did.

Passing on the opportunity to provide inside information to family and friends is not typical of

insider trading defendants.  *See e.g., United States v. Gansman*, 08 CR. 471 (MGC), Indictment,

May 27, 2008 (S.D.N.Y.), pgs. 8-9 (Gansman was an attorney who, for over a year, passed

information about several merger and acquisition transactions involving firm clients to his

girlfriend); *United States v. Holzer*, 09 Cr. 470 (VM), Sentencing Tr., September 29, 2009

(S.D.N.Y.), pgs 5, 18 (Holzer used brokerage accounts owned by relatives in carrying out the

insider trading scheme); *United States v. Okada*, 07 Cr. 144 (DC), Indictment, Feb. 26, 2007

(S.D.N.Y.), pgs. 4-5 (Okada passed the information he received to a relative to use to trade);

*United States v. Goehring*, 05 Cr. 209 (JES), Indictment, Feb 24, 2005 (S.D.N.Y.) pg. 3

(Goehring provided inside information to a friend for trading purposes).

Finally, and even more telling, is the fact that Don never traded in his personal accounts

based on any insider information he is alleged to have received.  In fact, Don has always kept the

majority of his personal savings, i.e., nearly 99%, in low-yield municipal bonds and only ever

traded nominal amounts in the securities markets.  Don, as a downstream tippee, coupled with

the lack of financial profits he personally received, and the fact that he never shared the

information with his family and friends despite having had the opportunity to do so, should place him at the lower end of the spectrum of insider trading culpability.

## II.   Similarly Situated Defendants Have Received Below-the-Range Sentences

A critical factor to be considered by this Court under Section 3553(a) is the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). Given the recent sentences in insider trading cases in this District, this factor favors a below-the-range sentence.

A review of recent insider trading cases in this District and the sentences imposed reveals that non-cooperating defendants with conduct similar to Don's often receive probationary sentences or sentences at levels substantially below the advisory Guidelines ranges. In fact, substantially below-the-range sentences have been imposed on defendants that would appear to be more culpable than Don, including some convicted after trial for trading, tipping inside information, and other more egregious conduct. *See, e.g., United States v. Gansman*, 08 Cr. 471 (MGC) (May 27, 2008).   Here is a table showing recent sentences that have been given for insider trading in the Southern District of New York:

| Name | Guidelines | Sentence Imposed | Personal Profits |
|------|-----------|------------------|------------------|
| Frederick Bowers<br>09 Cr. 496 (GBD) | 12-18 months | 3 years probation | **** |
| Ruopian Chen<br>07 Cr. 00730 (DC) | 30-37 months | 18 months prison | $600,000 shared profits |
| Randi Collotta<br>07 Cr. 143 (VM) | 12-18 months | 60 days prison,<br>6 months home confinement | $315,000 shared profits |
| James Gansman<br>08 Cr. 471 (MGC) | 41-51 months | 12 months and 1 day prison | $300,000 |
| Robert Goehring<br>05 Cr. 209 (JES) | 10-16 months | 2 years probation,<br>5 months home detention | $100,000 of avoided losses and profits |
| Eric Holzer<br>09 Cr. 470 (VM) | 12-18 months | 5 years probation, 270 days residential reentry center | $100,000 |
| Michael Koulouroudis<br>09 Cr. 440 (PGG) | 18-24 months | 3 months prison, 1 year home confinement | $200,000 |
| John Marshall | 46-57 months | 18 months prison, 1 year | Over $1,000,000 |

| | | home confinement | shared profits |
|---|---|---|---|
| 08 Cr. 924 (LTS) | | | |
| Ken Okada<br>07 Cr. 144 (DC) | 30-37 months | 3 years probation | **** |
| George Paparrizos<br>09 Cr. 400 (PAC) | 6-12 months | 3 years probation, 6 months home confinement | $25,000 |
| Xukia Wang<br>07 Cr. 00730 (DC) | 30-37 months | 18 months prison | $600,000 shared profits |
| Danielle Chiesi<br>09 Cr. 01184 (RJH) | 37-46 months | 30 months prison | **** |
| Mark Kurland<br>09 Cr. 01184 (RJH) | 30-37 months | 27 months prison | **** |
| James McDermott<br>00 Cr. 0061 (RO) | 24-30 months | 8 months prison | **** |

Of the defendants noted in the table, tippee-defendants who traded on information for personal profit received sentences below Don's applicable Guidelines range. In fact, even the defendants who engaged in *quid pro quo* type activity, compensating their sources of information, or who passed on the inside information to others were afforded leniency: Every one of the defendants represented in the above table received below-the-range sentences, often with little or no jail time.

In addition, many of the cases represented in the table above involved tippers who breached duties to their employers by misappropriating material non-public information and trading on it or providing it to third-parties for trading. Each of these tipper-defendants also received a significantly below-the-range sentence, and in some cases non-custodial, sentences. *See United States v. Collotta*, 07 Cr. 143 (VM); *United States v. Goehring*, 05 Cr. 209 (JES); *United States v. McDermott et al.*, 00 Cr. 0061 (RO). These outcomes offer even greater support for a below-the-range sentence for Don.

Moreover, the Supreme Court has made clear that Don, as a downstream tippee, is less culpable than "insiders and broker-dealers who selectively disclose[d] material nonpublic information." *See Bateman, Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299,

313 (1985) ("In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place.").[4]   In explaining its position, the Supreme Court rightly characterized the insider as the "fountainhead" of an insider trading scheme, and observed that:

> [I]nsiders and broker-dealers who selectively disclose material nonpublic information commit a potentially broader range of violations than do tippees who trade on the basis of that information. A tippee trading on inside information will in many circumstances be guilty of fraud against individual shareholders, a violation for which the tipper shares responsibility. But the insider, in disclosing such information, also frequently breaches fiduciary duties toward the issuer itself. . . . *Absent other culpable actions by a tippee that can fairly be said to outweigh these violations by insiders and broker-dealers, we do not believe that the tippee properly can be characterized as being of substantially equal culpability as his tippers." Id.* at 313-14 (citations and footnotes omitted).

The Supreme Court added that "deterrence of insider trading most frequently will be maximized by bringing enforcement pressures to bear on the sources of such information – corporate insiders and broker-dealers." *Id.* at 316; *see also SEC v. Thome*, 638 F. Supp 596, 617 (S.D.N.Y. 1986) ("the tipper's conduct, almost invariably, is more culpable than that of the tippee").

Judge McMahon recognized this distinction in sentencing an insider-tipper – Xujia Wang, commenting to her that "you are more culpable [than your husband-tippee]: you are the thief." Xujia Wang, et al., 07 Cr. 00730 (DC), Sentencing Tr., Dec. 4, 2007 (S.D.N.Y.),

---

[4] The Supreme Court referenced the legislative history of the Insider Trading Sanctions Act of 1984, § 2, 15 U.S.C. § 78u(d)(2) (1982), as support for its position on the relative culpability of tippers and tippees. The legislative history provides that "[a]bsent the tipper's misconduct, the tippee's trading would not occur" and a tipper is therefore "most directly culpable in a violation." *Bateman,* 472 U.S. at n.23 (citing H.R.Rep. No. 98-355, at 9, U.S. Code Cong. & Admin. News 1984, p. 2282).

p. 29. The heightened culpability of tippers, particularly insiders, is reflected in the Guidelines' two level enhancement for abuse of trust which is typically used to increase a tipper's offense level – before any unlawful gain is factored into the equation. Given the sentences imposed on these more culpable tippers, a below-the-range sentence for Don would provide a just punishment for the offense conduct.

Several factors are important here.  As mentioned above in Section I, Don did not personally profit from insider trading and he did not pass the information along to his family and friends.  It is also important to note that Don was a downstream tippee several steps removed from Jiau's inside source of information at Marvell. In fact, the stream of information flowed from the inside source to Jiau, from Jiau to Samir Barai ("Barai") and Noah Freeman ("Freeman"), and then from Barai to Don.  Whereas significant amounts of cash, gifts and favors were exchanged between the parties upstream from Don, Don never solicited nor paid Barai for the information regarding Marvell.  While there is no doubt that Don should have refused the material non-public information when it was voluntarily offered to him by Barai and that he crossed the line between socially acceptable conduct and criminality when he suggested that Empire Capital make a small trade on the information, under 18 U.S.C. 3553, Don's sentence should reflect that he is substantially less culpable than his co-conspirators.

Moreover, it was not Don's business model to search out and obtain material non-public information as a means of benefiting himself or the funds where he was employed.  To be sure, the majority of Don's success was a derivative of his hard work and ingenuity.  More often than not, Don's primary purpose in contacting Barai, Freeman and other individuals with whom he was associated at public companies was legitimate; however, there were instances when Don

would receive information that he believed to be material non-public information and Don concedes that he crossed the line.

The Court need only examine the Government's charging documents in this case to see that Don's conduct did not reach the depths of those around him. For example: Barai and Freeman are accused of trading Fairchild stock on material non-public information prior to Fairchild's January 25, 2007 earnings announcement. They shared the information with Don; however, Don did not trade and was not charged. Barai is accused of trading Actel stock on material non-public information prior to Actel's July 29, 2008 earnings announcement. Barai shared this information with Don; however, Don did not trade and was not charged. Barai is accused of trading Cypress stock on material non-public information prior to Cypress's July 17, 2008 earnings announcement. Barai shared this information with Don; however, Don did not trade and was not charged. Barai is accused of trading Nvidia stock on material non-public information prior to Nvidia's August 12, 2008 earnings announcement. Barai shared this information with Don; however, Don did not trade and was not charged. Don's conduct should be viewed in light of the tens of thousands of trades, amounting to over $7 billion worth of transactions in his career that Don either suggested or made personally while employed at Empire Capital and CR Intrinsic.

Finally, the Court must also take into consideration the fact that Don discarded evidence related to the conspiracy. While this factor is accounted for as an aggravating factor under the Guidelines, it should not preclude the Court from giving Don a below-the-range sentence here. In fact, this Court has found it appropriate to impose a below-the-range sentence even under circumstances where a defendant had engaged in significantly more substantial obstruction of justice. *See United States v. Giovanelli*, 464 F.3d 346, 355 (2d

Cir. 2006) (confirming a below-the-range sentence where the government presented evidence to show that the defendant had intentionally obstructed justice and was intending to do so in connection with what he knew was a murder investigation).

At his guilty plea allocution, Don stood before the court and took responsibility for destroying a flash drive and external hard drive after reading an article in the newspaper concerning an investigation regarding insider trading on Wall Street.  His conduct was wrong and he admits that.  But in meting out a sentence under 18 U.S.C. § 3553(a), respectfully, the Court should measure Don's conduct against the typical characteristics of an obstructive prosecution punishable within a Guidelines sentence.  Those elements do not exist here.  For example, Don never received personal notice from a governmental agency or prosecutorial body that he was under investigation.  Neither he nor the drives he discarded were under subpoena or some compulsion to preserve them.  Don was not provided a preservation letter or legal hold notice.  He was not advised by an attorney to retain documents.  Perhaps most significantly, to Don's knowledge at the time, neither Don nor any of his purported co-conspirators were told that they were the target subject, or even a witness to any criminal conduct.  Coupled with the other factors under 18 U.S.C. § 3553(a) a below-the-range sentence is just under the circumstances.

III.    **Don's Criminal Conduct is Not the Sum of The Man**

The behavior and conduct to which Don pleaded guilty are inconsistent with the manner in which Don otherwise conducted his life.  Don's history demonstrates integrity and compassion and devotion to friends and family and community.  Moreover, Don knows the difference between right and wrong and has conducted himself in most of his life on the right side of that line.  It is unfortunate that in this case he crossed the line.

The letters that have been submitted by family and friends afford insights into the person and character of Don. We know that Your Honor will consider the letters very carefully and factor them into your consideration in determining the appropriate sentence for Don. We provide excerpts from just some of the letters herein to more aptly illustrate Don's history and his personal characteristics.

A.    ***Don's Upbringing***

Don has always been devoted to his family. Don was born on March 18, 1976, in Bridgeport, CT to Gary and Patricia Longueuil. He is the older of two sons born to Gary and Patricia and has played an important role in his younger brother Andrew's life. At the age of fourteen, Don's father permanently separated from Don's mother and moved away from the family. Despite the fact that Don's father left the family at a critical point in his childhood, Don has nonetheless described his relationship with both of his parents as "close." After Don's father left the family, Don began to make significant contributions to the family and took on a father-type role with Andrew. That role has, in many ways, continued to the present day and has solidified a very close relationship between the two brothers. Andrew describes his relationship with his big brother in the following manner:

> He has acted like a father in the absence of our father while also being a big brother … When Donald and I were growing up he took me under his "wing", helping me become a better athlete and person.
>
> ***
>
> Donald, as a teenager took on the role of my father figure while making sure that I help out our mother as much as possible. He wanted to make sure that our family was being supportive of each other as much as possible because we have such a small family. When Donald came home on the weekends he and I would play games in the back yard of our home, play floor hockey in our basement or play knee hockey in the hallways. We would have such a great time, while sharing a lot of laughs and memories.

- 15 -

To the extent Don has experienced financial success in his life he has voluntarily shared that success with his family.  For example, Don has paid for the college tuition of his brother Andrew and for his mother when they were financially unable to do so.  Don also helps support his mother by providing her with money each month.  As detailed below, Don's willingness to share his talents and resources is not isolated to the things he has done for his family.

B.    **Don's Education**

Don attended Northeastern University on a partial athletic scholarship, graduating in 1999 with a BS in Psychology and a Minor in Finance.  While at Northeastern, Don regularly appeared on the Dean's list while participating in both varsity ice hockey and crew.  While attending college Don worked hard and earned the success he experienced.  One example of that success is told by Don's friend and former college professor, Randy Colvin:

> With about two weeks remaining in the semester, Don stopped by my office and asked if we could talk.  He sat down and said "I want a publication."  I laughed and told him I would like a six-pack of publications and a bag of chips.  He assured me that he was serious and that because he enjoyed my course, he wanted to collaborate with me on a research project that would lead to a publication in a scientific journal.  Don's request was unique. Most students ask me if they can work in my lab either to obtain research experience or to receive a favorable letter of recommendation for graduate school.  Don wanted the publication. I asked him why it was important to him.  He said it would help him get into one of Harvard's graduate programs.  I was skeptical, Don possessed average intelligence, had little chance of being accepted into Harvard's graduate school, and his interest in doing research with me would be short lived.  So I gave him a test.  I encouraged him to peruse the research literature, develop ideas for a research topic and come back and see me in two weeks.  Don left my office and I knew I would not see him again.
>
> Two weeks later Don was waiting outside my office door.  He had reviewed the research literature and developed some research ideas, and so began our research collaboration … About a year later we submitted our manuscript for publication and shortly thereafter received notice from the editor that our paper was accepted for publication in the Journal of Research in Personality.

> I have been a professor at Northeastern University for eighteen years and this is the only paper I have published with an undergraduate co-authors. I may have had the skills to conduct the research but Don's motivation and determination produced the publication. I can honestly say that if Don had not been involved, our paper would have never been completed.

C.   ***Don's Future Marriage and Family***

Don was arrested 19 days before he was planned to marry his fiancée, Mackenzie Mudgett. Don and Mackenzie met in October 2007 and became engaged in January 2010. During the course of their relationship Don and Mackenzie have become best friends. As a result of Don's arrest, there has been significant strain on their relationship and their marriage has been postponed indefinitely. Despite the setback, Don and Mackenzie still plan on marrying and starting a family together. Of those having been most hurt by Don's conduct, Mackenzie stands near or at the front of that line. It is rather remarkable given the circumstances that she has remained faithfully by his side. Mackenzie describes Don in the following manner:

> Don has an amazing heart and is completely selfless. He is incredibly caring, smart, devoted, and fun to be with. He is not pretentious, arrogant, or entitled. He has the ability and the desire to find the good in everyone. He goes out of his way to make everyone feel special, even those that others tend to avoid. He is the first person in line to help those in need, whether it is me, our families, our friends, or someone he has never met.

Mackenzie's description of Don is echoed by her parents. Her father writes:

> I first met Mr. Longueuil 3 years ago for lunch during one of my business trips to the Northeast. My first impression was that Don was polite, respectful, and practical. Contrary to what I was expecting, Don drove up to the restaurant in an older Jeep SUV with 100,000+ miles on it. He was not at all what I assumed was the stereotype on Wall Street. He was incredibly friendly and outgoing– not at all arrogant or flashy with money. Over the past few years, I have spent numerous weekends, golf outings, and holidays with Don, all confirming and building on my initial assessment of him as a humble and respectful gentleman.
> ***

- 17 -

> I support my daughter's decision to start her family with Don Longueuil and welcome him as my future son-in-law.

Her mother describes Don in much the same way:

> He is not one who takes advantage of others. In fact, quite the contrary - he helps the homeless by spending the night at his church about once a week when the church is open to the homeless. He helps our daughter with her team cycling and training. He is humble and kind.
>
> ***
>
> Bottom line, Donald Longueuil is a wonderful, kind and humble individual. I hope that you can see his true character and know that he has a lot to contribute to society.

## D.   *Don's Philanthropy*

Perhaps one of the best measures of a person is their treatment of others, especially those that are less privileged and unlikely to be able to reciprocate one day.  Respectfully, Don's life is paralleled by few in this regard.  What is truly significant about Don's charitable contributions is that he not only gives money, but has regularly and consistently given even more substantially of his time.   Any financially successful person can write a check and call themselves a philanthropist; it is rare however to find a financially successful person that not only buys a book for a child but reads it to them, that ladles the soup into the bowl of the hungry, that plays sports and coaches the child.  This has always been the case with Don.  He has provided countless hours since his teenage years to make sure young men and women had the guidance he lacked and craved.  To be around Don, even in this trying time, is inspirational.  Here are just a few examples of things Don's family and friends have noticed that he has done to directly support and help others in need:

> As we came to know Don better it was not a surprise later when Mackenzie told us that she wouldn't be able to join us for brunch on Sunday because Don had convinced her to join him at the soup kitchen where he regularly volunteered.

- 18 -

\*\*\*

When Don and Mackenzie were in Sarasota last year, it was no surprise to learn they had given some of their time that weekend to ringing bells for the Salvation Army … He does various activities (arts and crafts, book reading, and tutoring) with children who are hospitalized.  He also volunteers at St. Thomas Episcopal Church, helping to make 300 lunches and distributing them to the homeless on 9th Avenue.  He also helps to pack and distribute grocery bags and interacts with clients at Yorkville Common Pantry in association with the New York City Coalition Against Hunger.

\*\*\*

… Don has also contributed to the ministry at Heavenly Rest, particularly in the service of our shelter program.  Monday through Wednesday this church houses approximately 15 women who are either homeless or part of the working poor.  Don has graciously helped us keep the shelter open by volunteering, especially in these summer months, when many other volunteers go on vacation.

In addition, in 2007 Don was co-chair of a fundraising dinner held by Project Sunshine.  Project Sunshine is a nonprofit organization that provides free educational, recreational and social programs to children facing medical challenges and their families.  As co-chair, Don spent over six months making telephone calls to colleagues and other industry contacts in order to raise money for the organization.  Don has also personally attended hospitals in order to spend time reading to bedridden children and has participated and aided children in arts and crafts programs as a volunteer for Project Sunshine.

Don's passion for ice-skating, which has allowed him to compete in hockey and speed skating at very high competitive levels, has given him many opportunities to provide service to others.  For example, Don has held learn-to-skate clinics, he has volunteered to coach youth, he generated and helped incorporate new ideas for a foundation dedicated to providing disadvantaged/inner city youth with coaching and sporting equipment, and he volunteered as a Meet Director for the 2004 USA Junior Short Track Speed Skating Championship.  A friend and fellow athlete described Don's service to others in sports as follows:

> But we also shared a common dedication to helping others (including my two young daughters) find their own passion for it. Don was great with all the club's skaters, including the kids, and worked hard to make sure that they had coaching support and opportunities to compete and grow. In one particular example, he took on the role of meet director for our club's sponsorship of the Junior Nationals event, a role few people would accept due to the high demands, and relatively little recognition (save for seeing a lot of great younger athletes compete and grow). Don's enthusiasm, energy, and commitment to seeing that event through to a successful conclusion was a remarkable, but not uncommon example of how he brought help and support to the kids in the skating community well beyond his own personal and competitive interests.

Don's dedication to sports, both as a competitor and later through sports related service, has given him a deep appreciation for cooperation, loyalty and the importance of helping everyone to reach their highest potential. Don's actions on and off the athletic field of play have exemplified these characteristics.

In addition to the time and service Don has volunteered, Don has also been active in philanthropic giving. Significantly, Don has given money to secular and religious charitable organizations and has even donated money in the name of his grandmother to start a perpetual fund to give aid to people who are going through difficult times.

The service that Don has given to the several communities in which he participates is indicative of his integrity, commitment to philanthropy and the public good, and his kindness to friends and strangers alike. As the many letters to this Court on Don's behalf attest, the offense conduct is truly aberrational when viewed as a part, but not as the sum, of the totality of who Don is as a person. It truly does not comport with the life Don has lived, filled with humility, honesty, integrity and concern for the welfare of others. Don's good deeds have never been performed to gain status or enhance his image and should be given considerable weight in determining an appropriate sentence.

- 20 -

## IV. A Below-the-Range Sentence is Sufficient to Provide Just Punishment for the Offense

No matter the sentence in respect of prison and forfeiture that the Court ultimately deems appropriate, Don's punishment is already underway, is severe, and will continue throughout his life.  The numerous letters, specifically from Don's immediate family and his fiancé and her family, describe in detail and attest to the significant pain and suffering that Don has caused.  To be sure, more often than not, the primary victims of crime, the real victims especially in cases such as this, are the people who have devoted their lives, their love, and their energies to the upbringing and improvement of a person who then by betraying society also betrays them. Living with the reality of the pain Don has caused his family and friends, is the constant punishment and self-inflicted sentence that Don lives with and will continue to experience for a very long time going forward as a result of his wrongful conduct.

In addition, with his guilty plea and conviction Don has obliterated his professional reputation.  Living in the Google-age, Internet searches will always identify him first and foremost as an "insider trader," a convicted felon, and associate him with greed, selfishness and criminality.  Few will read this memo or the letters to understand better who Don truly is.  This is Don's own fault and he knows it.  And, as a result, regardless of what the court determines to be adequate, Don has already imposed upon himself a "life" sentence of sorts.

Don is a first time offender, and is deeply remorseful for the poor judgment he exercised and the unlawful activity in which he engaged. His life of 35 years has been predicated on hard-work and an innate, selfless drive to help others ranging from family members, to friends, to acquaintances to total strangers. He has been a pillar amongst his friends and his community and has been a true asset to society. He is not a criminal from whom the public needs protection and

sending him to jail would accomplish nothing from a deterrence standpoint. Rather, society will benefit from Don's positive works if he is given the chance.

## Conclusion

For the foregoing reasons, Don respectfully submits that a below-the-range sentence and $1,251,685 forfeiture is sufficient, but not greater than necessary, to comply with the statutory directives set froth in 18 U.S.C. § 3553(a).

Dated:   New York, New York          ALSTON & BIRD LLP
         July 22, 2011


                                     _Craig Carpenito_ / JDA
                                     Craig Carpenito
                                     Gary Adamson
                                     90 Park Avenue
                                     New York, New York 10016
                                     (212) 210-9400

                                     *Counsel for Defendant Donald Longueuil*

32758346

- 22 -